**UNITED STATES of America,**
Appellee,

v.

**Ronald W. JORDAN, Appellant.**
**No. 72–1074.**

United States Court of Appeals,
Fourth Circuit.

Argued May 30, 1972.

Decided Sept. 5, 1972.

Richard E. Crouch, Arlington, Va. (Court-appointed counsel), for appellant.

Gilbert K. Davis, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., and Joseph A. Fisher, Asst. U. S. Atty., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Ronald W. Jordan appeals his conviction of assault with intent to murder by a jury in the District Court for the Eastern District of Virginia. He assigns as error, *inter alia*, the failure of the court to grant a continuance to enable investigation of witnesses, the failure of the court to order the production of a government witness' grand jury testimony, and the disallowance of a motion

to suppress the victim's in-court identification of the defendant. We think none of these assignments of error (nor numerous others we need not discuss) requires reversal, and accordingly affirm the judgment below.

I.

Jordan was indicted for an apparently unprovoked knife attack on another inmate, Eugene H. Cohen, at Lorton Reformatory in Virginia. In planning his defense, his court-appointed attorney met informally with the United States Attorney and was told the substance of the testimony which two eyewitnesses to the attack, Watkins and Williams, would give. However, the government refused to disclose the names of these two witnesses, and a motion to compel disclosure under Rule 16, Federal Rules of Criminal Procedure, was denied. On the day of the trial, the defendant moved for a continuance when the identity of the eyewitnesses became known, but this, too, was denied. Jordan claims that to deny both discovery of these witnesses' names and a continuance to investigate them once their identity is known was error. We disagree.

■■■■ It is settled in this circuit that "[o]nly in a capital case is the government required to furnish a pretrial list of government witnesses." United States v. Chase, 372 F.2d 453, 466 (4th Cir. 1967); 18 U.S.C. § 3432. The court in its discretion may order the government to produce such a list under Rule 16, Federal Rules of Criminal Procedure,[1] but whether or not it is an abuse of discretion not to do so, and whether it is an abuse of discretion not to grant a continuance once the witnesses' names become known, depends, we think, on whether the denial of such motions amounts to a denial of the defendant's right of confrontation in violation of the Sixth Amendment. We find no such violation here.

■ Of course, the clearest violation of the Sixth Amendment's guarantee of the right of confrontation is where the defense is not allowed to examine the prosecution witnesses at all. Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.E.2d 314 (1966). The Supreme Court has recognized, however, that a defendant's Sixth Amendment rights may also be violated by less than a complete denial of all cross-examination. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). We think Jordan fails to show a sufficient diminution of the right of cross-examination to come within the protection of the rule of these cases.

In *Alford* the district court refused to allow the defense to question a prosecution witness about his present residence. In reversing, the Supreme Court held the defendant was entitled to elicit on cross-examination that the witness was in federal custody on the theory that a jury might infer "that his testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States, which was conducting the present ∼rosecution." (citations omitted). Alf∟ ⌐ v. United States, *supra* 282 U.S. 687 at 693, 51 S. Ct. 218 at 220. Thus the trial court's error consisted of cutting off "all inquiry on a subject with respect to which the defense was entitled to a reasonable cross examination." *Alford, supra* at 694, 51 S.Ct. at 220.

In Smith v. Illinois, *supra*, the issue upon which the outcome of the trial turned was the credibility of the chief prosecution witness, whose testimony differed in crucial respects from that of the defendant charged with selling narcotics to this witness. In light of the importance of the credibility resolution, the Court held that to deny to the defense the right to ask this witness his

1. United States v. Jepson, 53 F.R.D. 289 (E.D.Wis.1971); United States v. Leichtfuss, 331 F.Supp. 723, 732 (N.D.Ill. 1971). *See* Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).

correct name and address, when the witness admitted that the name he had given on direct examination was false, was error. "To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Smith, supra,* 390 U.S. 129 at 131, 88 S.Ct. 748 at 750.

We think neither of these cases helps Jordan. Unlike *Smith* and *Alford,* the scope of cross-examination was not in any way curtailed. Furthermore, from his conversations with the United States Attorney, Jordan's attorney was aware of what the two eyewitnesses would say on direct examination. He was also aware that they were both convicted felons, and this fact was brought out on cross-examination. Likewise, he knew the name of the victim and that the victim would positively identify Jordan as his assailant.

Thus, the defendant's complaint boils down to the theory that, if the defense had known the names of the witnesses, or, once having ascertained their names, if a continuance had been granted, it might have been possible to unearth something more with which to discredit their testimony. We recognize that counsel may sometimes need time to investigate witnesses. But on the facts of this case it was not an abuse of discretion to fail to grant a continuance.

Even now, long after the event, it is not suggested to us that investigation would have been fruitful. These witnesses were not presented under false colors as persons of apparently good character and reputation, but, instead, the fact that they were convicted felons was brought out at the trial. Any further testimony as to the specific nature of their offense or offenses would have been cumulative. That they were felons, without more, tends to impeach credibility. Moreover, counsel was not refused

the opportunity to inquire about any and all prior offenses.

Although we do not base our decision on the harmless error doctrine, it is worth mentioning that, unlike *Smith, supra,* the victim's testimony positively identifying Jordan as his assailant was itself enough to sustain conviction even if Williams' and Watkins' testimony had somehow been even more discredited than it was. Furthermore, Jordan's alibi that he was playing basketball at the time of the knife attack was flatly contradicted by the testimony of prison guards.

We think the government properly refused to disclose the names of these inmate witnesses to the assault. To have done so might have endangered them. We hold that it was not error for the trial judge to decline to grant a continuance for the purpose of further investigation of these witnesses prior to cross-examination.

## II.

█ The United States has admitted that it was error to fail to supply the defense with a transcript of Watkins' grand jury testimony.[2] Where such material has been erroneously withheld from the defense, we think the trial court is usually in the best position to determine if the defendant could have used the grand jury testimony in his defense. *Harris v. United States,* 140 U.S.App.D.C. 21, 433 F.2d 1127 (1970). However, since Watkins' testimony before the grand jury does not vary from his testimony at trial, remand would serve no purpose. The error is harmless beyond a reasonable doubt.

## III.

█ Jordan's contention that his victim's in-court identification should have been suppressed because tainted by an

2. Thus we do not reach the question of the extent to which Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), has changed the circumstances, if any, under which grand jury minutes may be withheld from the defense. *See* Harris v. United States, 140 U.S.App.D.C. 21, 433 F.2d 1127 (1970); United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967).

impermissibly suggestive out-of-court identification is without merit. Not only did the evidence indicate that Cohen's in-court identification was not influenced by the out-of-court photo identification, but also we do not think that the fact that the defendant's photograph had the words "Dist. of Col. Dept. of Corr." in very small letters beneath his picture is suggestive in this case. Obviously Cohen's assailant was in custody and all of the photographs shown to Cohen were mug shots, each bearing the name of a prison. Cohen had no way of knowing when these pictures were taken or in which prison, if any, the people represented by the photographs were when he examined them. Thus a geographical indication on the pictures would not help him identify his assailant.

We have examined the defendant's other contentions and find them without merit. The judgment of the district court is

Affirmed.

SOBELOFF, Senior Circuit Judge (dissenting):

While I have serious misgivings as to several matters raised in this appeal, I limit my dissent to a single point—the propriety of the trial court's denial of the motion for a continuance to enable defense counsel to investigate the background of the previously unidentified witnesses, Carl Milton Watkins and Bennie Lee Williams. I think the trial court's ruling on this motion was error —constitutional error in fact. The ruling embodied such a high potential for prejudice that a new trial is required.

The majority's treatment of this issue may be faulted on a number of grounds: not only does the decision grant the Government an unfair tactical advantage at trial by largely insulating its witnesses from effective attack on their credibility, but it contravenes the clear language of the Supreme Court in similar cases and substantially constricts the constitutionally-based right of effective cross-examination. Before this decision, a delicate accommodation existed between the prosecution's need to protect potential witnesses from needless harassment and intimidation on the one hand and, on the other, the right of the defendant, often limited in his resources, to obtain access to information vital to the conduct of his defense. The majority unjustifiably and unnecessarily shifts the balance to favor the Government, in derogation of important constitutional principles.

I

The background of this case is as follows:

In its effort to prove that Jordan did indeed attack Cohen, the Government relied upon three principal witnesses: Cohen himself and two other Lorton inmates who lived in the same dormitory as Cohen, Carl Milton Watkins and Bennie Lee Williams. Williams was an eyewitness to the assault and identified Jordan as the perpetrator. Watkins, although unable to identify Jordan, corroborated a number of peripheral points in the testimony of Williams and Cohen.

Jordan's defense was an alibi. He asserted that, at the time of the attack on Cohen, he was playing basketball with three friends. Michael Sturdevant, Willie J. Sheffield and Andrew Alphonso Cook, Jr., all inmates of Lorton, testified in support of Jordan's story.

Upon the appearance of witness Watkins, defense counsel moved for a continuance, explaining that:

the Government has kept his identity secret up to this time and the Defense would be in the position of trying to cross examine him without having any idea of what his answers would be, and we have had no opportunity whatever to investigate as to whether the man might be a certified incompetent or a lifelong enemy of Jordan or anything like that, and I hate to delay the case, but I think the Defense has the duty to investigate the witness and probe sources, if possible, of bias.

The idea would be to go down to Lorton and ask other inmates about Mr. Watkins, talk to him, if he is willing to talk to us.

This motion, renewed upon Williams' appearance, was denied by the court without explanation.

The motion for a continuance was part of a running battle over defendant's discovery efforts. Prior to trial, the defense moved for production of a list of the witnesses the Government intended to call, along with the criminal records, if any, of each. The Government opposed the motion, principally on the ground that to grant it would compromise the safety of its prospective witnesses. These defense requests were refused. Later, an assistant prosecutor, in an informal conference with the defense, agreed to reveal the expected substance of the testimony of the major prosecution witnesses, but still persisted in the earlier refusal to reveal their identities.[1]

There is no claim that, prior to the testimony of Watkins and Williams, the defendant knew, or could have discovered on his own, the identities of these witnesses or their backgrounds.

Precious little background information came to light at trial. A defense request for Watkins' and Williams' grand jury testimony was rejected, although the testimony had been transcribed and was readily available.[2] The sole concession made to the needs of the defendant was the production of a report summarizing an FBI interview with Williams.

This report, consisting of two typed pages, was delivered to the defense attorney after Williams' testimony-in-chief. The trial judge thereupon allowed Jordan's attorney a few minutes, while court remained in session, to review the report before embarking on cross-examination. Armed solely with this document, it was the defense attorney's task to challenge the credibility of these crucial eyewitnesses to the crime charged.

Our duty here is to determine whether the trial court, in denying the requested continuance, so circumscribed the defense as to deprive it of a reasonable opportunity for effective cross-examination. Considering the pivotal nature of the testimony of these two "surprise" witnesses, I would hold that the defense was so hobbled as to impair gravely the essential fairness of the trial.

II

A

The right to an effective cross-examination is a constitutional right, derived from the Sixth Amendment's guarantee that every criminal defendant have an opportunity to confront his accusers. Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This does not mean, of course, that all limitations on cross-examination are constitutionally invalid. For example, the trial judge has the discretion to exclude repetitious questions and those that do no more than annoy, harass or embarrass the witness.[3]

1. I view with considerable suspicion the Government's claim that, to reveal the witnesses' identities prior to trial would have endangered them. If it be assumed that Watkins' and Williams' safety were threatened *before* trial, by what logic did that threat evaporate *at trial*, when the hidden names were voluntarily revealed for the first time? Presumably, once these witnesses' identities became known they were as open to threats and retaliation in order to convince them to recant, as they would have been before trial. In any event, it is significant that all of the prosecution's witnesses, as well as the defendant, were in custody where, with a

minimum of effort, the witnesses could have been segregated and their safety thereby insured. The only difference that resulted from the delay in the revelation of the witnesses' identity was that the defendant was inhibited from making an effective investigation.

2. This rejection, the Government now admits, was error.

3. E. g., United States v. Egenberg, 441 F.2d 441 (2 Cir. 1971); United States v. Migliorino, 238 F.2d 7 (3 Cir. 1956); Martin v. Texas Emp. Ins. Ass'n, 193 F.2d 645 (5 Cir. 1952).

But all issues concerning cross-examination do not melt away upon invocation of the trial judge's discretion:

It is only after the right of cross-examination has been substantially and thoroughly exercised that allowance of further cross-examination becomes discretionary with the trial court.

United States v. Dickens, 417 F.2d 958, 961 (8 Cir. 1969) (quoting Touhy v. United States, 88 F.2d 930, 934 (8 Cir. 1937)). *See also* United States v. Jorgenson, 451 F.2d 516 (10 Cir. 1971). In concrete terms, then, the trial judge's discretion insulates only his decision that an *area* of cross-examination has been *sufficiently explored* and that further inquiry would be pointless. United States v. Jorgenson, *supra* at 519; United States v. Varelli, 407 F.2d 735, 751 (7 Cir. 1969). A considerably stricter standard applies when an appellate court is called upon to review a ruling which *foreclosed altogether* a valid area of cross-examination:

Complete foreclosure of cross-examination as to a subject matter relevant to the witness's credibility, which may have deprived the jury of access to information bearing upon the trustworthiness of crucial testimony, cannot be treated * * * as falling within the court's discretion * * *.

United States v. Kartman, 417 F.2d 893, 897 (9 Cir. 1969).

Thus, for example, a defendant may not be barred from inquiring into the bias of an opposing witness, his prior inconsistent statements,[4] or other facts which may have a reasonably direct bearing on the credibility of the witness.[5] To do so frustrates the effectiveness of this truth-revealing device so vital to our adversarial system. Beau-

dine v. United States, 368 F.2d 417, 424 (5 Cir. 1966).

The factor which distinguishes this case from those cited above is the uncertainty surrounding the information to which defendant was, in effect, denied access. Bias, if proven, and prior inconsistent statements, if brought to light, are undeniably relevant facts bearing heavily on the ultimate question of guilt or innocence. If present, they should never be concealed from the jury. *Cf.* Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).[6] Here, on the other hand, facts constituting bias or otherwise reflecting on credibility may or may not exist; at this juncture we simply do not know. This is the effect of the court's ruling shutting off inquiry. The defense sought only to prospect for impeaching evidence to place before the trier of fact. No confident judgment can be made as to whether the desired investigation of Watkins' and Williams' backgrounds and associations at Lorton would have been fruitful from the defense's point of view.

The question therefore is whether the constitutional right to an effective cross-examination on credibility embraces a coordinate right to a reasonable opportunity to search for relevant facts upon which to predicate such a cross-examination.

### B

The Supreme Court has clearly affirmed the existence of this right, but the majority in this case, I regret to say, has shut its eyes to the plain import of the decided cases. In Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), for example, the Court defined as one of the purposes of cross-examination "that the witness may

---

4. United States v. Barash, 365 F.2d 395 (2 Cir. 1966), cert. denied, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1967).

5. District of Columbia v. Clawans, 300 U.S. 617, 630–632, 57 S.Ct. 660, 81 L.Ed. 843 (1937).

6. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. 360 U.S. at 269, 79 S.Ct. at 1177.

be identified with his community so that *independent testimony may be sought and offered* of his reputation for veracity in his own neighborhood." 282 U.S. at 691, 51 S.Ct. at 219 (emphasis added). More recently, the Court reaffirmed this view as it upheld the right of the defense to inquire as to the correct name of a prosecution witness:

> [W]hen the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" through cross-examination must necessarily be to ask the witness who he is and where he lives. *The witness' name and address open countless avenues of in-court examination and out-of-court investigation.* To forbid this most rudimentary inquiry at the threshold is to emasculate the right of cross-examination itself.

Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968) (emphasis added).

The Government would dismiss *Alford* and *Smith* as addressed only "to the permissible scope of cross-examination." This interpretation is, at best, naive. A cross-examiner seeks the name and address of an opposing witness not out of idle curiosity; it is of little practical worth to be told belatedly the name and address of the accuser and then, as in this case, to be denied the opportunity to put this newly-uncovered information to work. To my way of thinking, the above-quoted language makes it crystal clear that the identification of an opposing witness is but a starting point from which further investigation may be launched to uncover other facts of more immediate aid to the defense. Reading the Constitution to require the disclosure of the witness' identity, but, in the next breath, denying any effective use of that information, reduces the solemn mandate of the Sixth Amendment to a logical plaything. I cannot read, in the *Alford* and *Smith* decisions, such a casu-

istical intention on the part of the Supreme Court.

As for the majority's effort to distinguish this case from *Smith* and *Alford,* I find utterly incomprehensible the asserted ground that "unlike *Smith* and *Alford* the scope of cross-examination was not in any way curtailed." Plainly, the scope of cross-examination was here sharply limited. Being told the substance of the witnesses' testimony beforehand is no adequate substitute for an opportunity to the defendant to search out the matter for himself. A defendant should not be confined to his adversary's summation, but is entitled to make an independent appraisal of the data bearing on the reliability of the prosecuting witness. He should not be compelled to accept the judgment of the prosecutor or the FBI as to what may be useful areas for investigation. Much depends on who is passing judgment. The defense should be permitted to judge the matter for itself and not be bound by the judgment of those whose interests are different and possibly hostile.

### C

Concededly, the Constitution does not require every witness testifying for the prosecution to be the subject of a full-scale defense investigation. The basic question we are called upon to answer is whether, on the facts of this case, cross-examination could be "effective" without any opportunity for the requested investigation. Certainly, where impeachment has been undertaken effectively with available background facts, the district court has discretion to rule that further repetitive information can be withheld without offending fundamental fairness.[7] But none of the decided cases holds that the trial court has the discretion to cut off *all* access to impeaching background material.

This is not a case where the information to be sought in the proposed inves-

---

7. United States v. Saletko, 452 F.2d 193 (7 Cir. 1971); United States v. Varelli, 407 F.2d 735 (7 Cir. 1969).

tigation was available from alternative sources, or one in which the defendant sought facts duplicative of information already in his possession, see United States v. Baker, 419 F.2d 83 (2 Cir. 1969), or even one where available information could have been used to attack credibility effectively, see United States v. Daddano, 432 F.2d 1119 (7 Cir. 1970); United States v. Saletko, 452 F. 2d 193 (7 Cir. 1971). Here, no information which might bear on the witnesses' credibility could be procured by the defendant before or during trial. In this regard, the defendant was entirely at the prosecution's mercy, protected only by the prosecutor's slim duty to reveal evidence he might come upon which was favorable to the defense, Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed. 2d 737 (1967); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and to correct testimony of his witnesses known to be perjurious. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This is hardly an adequate substitute for an independent investigation conducted by the defendant's own counsel. Justice becomes an empty word indeed when the accused must rely on his accusers to ferret out information with which to conduct his defense.

For these reasons, I conclude that, by denying the requested continuance, the trial court, in effect, foreclosed any real cross-examination on credibility and denied the defense the invaluable opportunity to challenge the credibility of the Government's witnesses. Alford v. United States, supra, 282 U.S. 687 at 692, 51 S.Ct. 218. This denial rendered effective cross-examination an illusion and was, I submit, constitutional error.

### III

The present majority apparently assumes, along with the Government, that if the District Court committed error in denying the requested continuance, the error was harmless because the majority cannot imagine, and appellant has not demonstrated, how he was prejudiced.

I cannot acquiesce in this reasoning.

Normally, once an error of constitutional magnitude appears, it may be held harmless, and hence ignorable, only if the Government is able to demonstrate beyond a reasonable doubt that the error engendered no prejudice. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[8] No less does the general rule apply to the Sixth Amendment's right of effective cross-examination. Where, through error, that right has been blocked, prejudice need not be shown; it inheres "from a denial of the opportunity to place the witness in his proper setting and place the weight of his testimony and credibility to a test, without which the jury cannot properly appraise him." Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218 (1931).[9]

8. With considerable astonishment I read that the majority feels "it is worth mentioning that * * * the victim's testimony positively identifying Jordan as his assailant was itself enough to sustain conviction * * *." When assessing the harmfulness of a constitutional error, the mere existence of sufficient untainted evidence to support the conviction is irrelevant. Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Unless the evidence of guilt outside the shadow of the constitutional violation may be termed "overwhelming" (and I find it impossible to place this case in that category), our task is to decide only whether there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy, supra at 86–87, 84 S.Ct. at 230. If so, a new trial is mandated. Under such a standard, there is no place for inquiry into the sufficiency of the evidence.

9. See also, United States v. Jorgenson, 451 F.2d 516 (10 Cir. 1971), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972); United States v. Dickens, 417 F.2d 958 (8 Cir. 1969). R. Traynor, The Riddle of Harmless Error, 68–69 (1970).

Of course, uninformed speculation as to harmlessness has no place in such an ap-

The majority appears to place great reliance on its observation that "even now, long after the event, it is not suggested to us that investigation would have been fruitful." For a number or reasons, I believe such a statement improper in the context of this case. First, it assumes that, if the denial of the continuance was error, the defense is under some obligation to conduct the requested investigation, after the conviction below, in order to show prejudice in the trial court's error. As demonstrated above, it is not and has never been the defendant's burden to show prejudice emanating from a constitutional error. On the contrary, the onus is always on the prosecution to prove the error harmless, that is, in this case, that beyond a reasonable doubt an investigation would have been fruitless. No such showing was made or attempted here.

The second flaw in the majority's approach lies in the fact that the defense was never requested by this or any other court to undertake the background investigation denied at trial. The majority, in the above-quoted statement, produces out of thin air a requirement the existence of which the defense could never have suspected prior to this opinion. Not surprisingly, the defense has made no search and, at this late date, is punished for failing to undertake a task which, in these circumstances, has never before been required.

Moreover, a practical view of the predicament in which the trial court's ruling placed the defendant aptly demonstrates the prejudice which inheres in this type of error. Relying, as it did, on a claimed alibi, the defense was faced with an imperative need to discredit on cross-examination the testimony of prosecution witnesses Watkins and Williams. Any experienced practitioner can attest that, even in the best of circumstances, cross-examination is a demanding art, heavily dependent on thorough advance preparation. As Professor McCormick puts it: "preparation before trial is the only soil from which, in the day-to-day run of cases, successful cross-examination can grow." [10] McCormick, Treatise on Evidence, § 30 at 60 (Cleary ed. 1972). When all opportunity for preparation is foiled, the right of cross-examination is drained of substance.[11]

Faced with the damaging testimony of Watkins and Williams, what background information was available to the defense to suggest fruitful lines of cross-exami-

proach; doubt should always be resolved in favor of the victim of a constitutional transgression. Gordon v. United States, 344 U.S. 414, 420, 73 S.Ct. 369, 97 L.Ed. 447 (1953); Young v. State of Maryland, 455 F.2d 679, 687–688 (4 Cir. 1972) (Sobeloff, J., dissenting).

10. In a candid essay, noted trial attorney Louis Nizer puts it this way:
> Most lawyers who tell you of brilliant cross-examination will not confess this: We are entranced by a brilliant flash of insight which broke the witness, but the plain truth of the matter is, as brother to brother, that ninety-nine per cent of effective cross-examination is once more our old friend "thorough preparation," which places in your hand a written document with which to contradict the witness. That usually is the great gift of cross-examination."

Nizer, The Art of Jury Trial, 32 Cornell L.Q. 59, 68 (1946).

11. The majority points out that the jury knew the prosecution's witnesses were criminals and reasons that because of this, any further testimony in this area could only have been "cumulative." I cannot subscribe to such reasoning. Law and logic both tell us that the simple revelation that a witness is a convicted felon does not exhaust useful and perfectly permissible attacks on credibility. An instructive example of this principle can be found in United States v. Hogan, 232 F.2d 905 (3 Cir. 1956), in which it was held to be reversible error for the trial court to refuse to permit the defense to show that two important prosecution witnesses, known to have been convicted of a related crime, would not be sentenced until after the instant trial and that both had agreed to testify against the defendant in the hope that they would receive preferential treatment, in their own cases, in return for their cooperation.

nation? The sole source of background material was the two-page FBI report which the defense was handed just after each witness testified. In open court, under the impatient gaze of the jury, defense counsel was afforded but a few minutes too read the report, analyze it, compare its substance with the testimony-in-chief, and attempt to extract possible inconsistencies to lay before the jury. The circumstances obviously do not add up to the searching, informed, truth-revealing cross-examination "which is really the heart of our adversary system." Beaudine v. United States, 368 F.2d 417, 424 (5 Cir. 1966); United States v. Dickens, *supra*.

In short, the trial court's denial of the requested continuance created a condition that bristled with possibilities of prejudice. By shrouding its witnesses in an impregnable anonymity, the Government stripped the defendant of the essential opportunity for effective cross-examination. By refusing a reasonable continuance, the court sealed the unfair result and passed up the only chance of correction.

In analogous circumstances, the Supreme Court has firmly rejected the majority's approach in this case:

> To say that prejudice [from a refusal to allow "reasonable cross-examination"] can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. Alford v. United States, *supra*, 282 U.S. at 692, 51 S.Ct. at 219.

The analysis applies here with undiminished force and require that appellant Jordan be afforded a new trial at which he shall have a fair opportunity to exercise the right of cross-examination.

I therefore dissent.